IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MISSISSIPPI VALLEY TITLE | ) | |
| INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 11-0538-WS-C |
| | ) | |
| MARION BANK AND TRUST | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on the motion of defendant J. Garrison
Thompson for summary judgment and on the competing motion of plaintiffs
Mississippi Valley Title Insurance Company ("Mississippi Valley") and Old
Republic National Title Insurance Company ("Old Republic") (collectively, "the
plaintiffs") for partial summary judgment.  (Docs. 49, 64).  The movants have
filed briefs and evidentiary materials in support of their respective positions,
(Docs. 50-63, 65-67, 71, 78-80, 84, 86), and the motions are ripe for consideration.

## BACKGROUND

Thompson, a licensed attorney, performed title work for Mississippi Valley
pursuant to an agency agreement ("the Agreement").  In November 2001, while
acting under the Agreement, Thompson performed a title search with respect to
certain property ("the Rabb Property") in connection with the Rabbs' procurement
of a loan from CTX Mortgage Company ("CTX").  While acting under the
Agreement, Thompson thereafter issued a commitment for title insurance and a

title policy ("the 2001 Policy") on behalf of Mississippi Valley.[1]  The 2001 Policy insured the CTX mortgage as a first mortgage lien even though an earlier mortgage to defendant Marion Bank & Trust Company ("Marion Bank") was of record.

In 2003, the Rabbs sought an additional mortgage loan from Marion Bank. Again acting under the Agreement, Thompson performed a title search and thereafter issued a title commitment and a title policy ("the 2003 Policy") to Marion Bank.  The commitment did not set out the CTX mortgage as a requirement or exception, although the subsequently issued 2003 Policy did except that mortgage.

When the Rabbs defaulted on payment some years later, Marion Bank held a preferred position, leaving the movants exposed to payment to Wells Fargo on the 2001 Policy, an exposure potentially increased by the failure of the 2003 commitment to except the CTX mortgage.  Count One of the amended complaint alleges that Thompson's failures breached the Agreement and also breached common-law duties.[2]

The plaintiffs seek partial summary judgment as to their claims under Count One.  The relief sought is partial because it addresses Thompson's liability but not the quantum of damages.  Thompson moves for summary judgment on the grounds that Count One is barred by the statute of limitations.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] Pursuant to a separate agreement, Old Republic jointly insures under the 2001 Policy.  Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") is the successor in interest to the CTX Mortgage and is the current insured under the 2001 Policy.

[2] Count Two is brought by co-plaintiff Wells Fargo against Marion Bank.  Marion Bank's motion for summary judgment is addressed in a separate order.

Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id.*  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party."  *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I.  Thompson's Motion for Summary Judgment.

Thompson argues that Count One is governed by the Alabama Legal Services Liability Act ("the Act"), including its limitations period.  The plaintiffs argue that Count One is timely even if the Act applies but that the Act does not apply in any event.  (Doc. 65 at 21).

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

### A. Timeliness under the Act.

Under the Act, an action generally must be commenced "within two years after the act or omission or failure giving rise to the claim, and not afterwards." Ala. Code § 6-5-574(a). There is a limited exception when "the cause of action is not discovered and could not reasonably have been discovered within such period," but "in no event may the action be commenced more than four years after such act or omission or failure." *Id.*

The Alabama Supreme Court has offered varying explanations of when the limitations period under Section 6-5-574 begins to run. It has sometimes stated that "'a legal-malpractice cause of action accrues, and the statute-of-limitations period begins to run, when "the act or omission or failure giving rise to the claim" occurs, and not when the client first suffers actual damage.'" *Ex parte Seabol*, 782 So. 2d 212, 214 (Ala. 2000) (quoting *Ex parte Panell*, 756 So. 2d 862, 868 (Ala. 1999) (plurality opinion)). On other occasions, it has indicated that the limitations period does not begin to run on the date of the act, omission or failure but on the date the plaintiff first suffers a "legal injury" from the act, omission or failure. *E.g., Sirote & Permutt, P.C. v. Bennett*, 776 So. 2d 40, 45 (Ala. 2000); *Michael v. Beasley*, 583 So. 2d 245, 252 (Ala. 1991). In a pair of more recent decisions, the Supreme Court has recognized the two strands of authority but declined to elect between them, since the plaintiffs' claims were barred under either approach. *Coilplus-Alabama, Inc. v. Vann*, 53 So. 3d 898, 905-07 (Ala. 2010); *Denbo v. DeBray*, 968 So. 2d 983, 988-89 (Ala. 2006).

In *Mississippi Valley Title Insurance Co. v. Hooper*, 707 So. 2d 209 (Ala. 1997), the defendant issued title opinions incorrectly certifying that various mortgagees seeking title insurance would have a first mortgage lien, and he thereafter issued title insurance policies based on these inaccurate certifications. *Id.* at 211. The Court utilized the "legal injury" approach and held that, under this test, "any cause of action Mississippi Valley had against Hooper for issuing insurance policies based on a faulty title opinion accrued when the policies were

issued, and not when Mississippi Valley later settled lawsuits filed against it based on the policies." *Id*. at 213.  The *Hooper* Court expressly "reject[ed] the argument that Mississippi Valley incurred legal injury only when it had to pay claims made under its policies." *Id*.; *see also Bennett*, 776 So. 2d at 45-46 (discussing *Hooper* and concluding that the plaintiffs first suffered legal injury from a faulty legal opinion when they purchased investment certificates in reliance thereon, not on the later date the legal opinion was judicially determined to be faulty).

It is uncontroverted that the 2001 Policy was issued in November 2001 and that the 2003 Policy was issued in November 2003.  If the Act applies to Count One, under *Hooper* the limitations period began to run at those times.[4]  Under the two-year period of Section 6-5-574(a), the limitations period expired in November 2003 and November 2005, respectively.  The plaintiffs do not invoke the extended limitations period for delayed discovery of the cause of action but, even had they done so and done so successfully, the limitations period would have expired no later than November 2005 and November 2007, respectively.  Since this action was not filed until September 2011, Count One cannot satisfy Section 6-5-574(a).

The plaintiffs offer several reasons why the limitations period of Section 6-5-574 does not bar their claim even if the Act applies.  First, they argue that Count One is timely under Section 6-2-6.  (Doc. 65 at 21-22). Pursuant to that statute, the limitations period does not begin to run as to a principal's claim against its agent "until the liability of the principal for the act or omission of such deputy or agent is ascertained by an action of the party aggrieved against the principal."  Ala. Code § 6-2-6.  The plaintiffs assert that their liability to Wells Fargo has yet to be ascertained and that they have paid nothing to Wells Fargo, and they conclude that the limitations period under Section 6-2-6 has yet to expire or even commence.

---

[4]  Under the "occurrence" test of *Seabol* and *Pannell*, the limitations period would begin to run at or before these times, since issuance of the policies was Thompson's final "act or omission or failure."

Section 6-5-574, however, expressly addresses the interplay between its provisions and those of Section 6-2-6.  "Subsection (a) of this section shall be subject to all existing provisions of law relating to the computation of statutory periods of limitations for the commencement of actions, namely, Sectio[n] … 6-2-6 …; provided, that notwithstanding any provisions of such sections no action shall be commenced more than four years after the act, omission, or failure complained of [with a limited exception for minors]."  Ala. Code § 6-5-574(b). An action that is barred by the four-year limitations period of Section 6-5-574(a) thus cannot be rescued by resort to Section 6-2-6.  As the *Hooper* Court noted, "this statute [Section 6-2-6] is specifically mentioned in, and therefore subsumed by, the ALSLA."  707 So. 2d at 213 n.4.  The plaintiffs insist this statement is dictum, (Doc. 84 at 5), but it was clearly made in order to refute the dissent's argument that the plaintiff's indemnity claim could be timely under Section 6-2-6. 707 So. 2d at 217-18 (Snodgrass, Special C.J., dissenting).  At any rate, the plaintiffs fail to offer any explanation how the reading of *Hooper*, and this Court, could be erroneous.

Section 6-2-3, which provides that, in cases of fraud the plaintiff "must have two years to prosecute his action" after discovering the fact constituting the fraud, is also listed in Section 6-5-574(b).  The Alabama Supreme Court has described the interplay of these statutes as follows:  "[U]nder § 6-5-574(b), a legal malpractice action based on allegations of fraud [under Section 6-2-3] must be commenced within two years after the discovery by the aggrieved party of the fact constituting the fraud; provided, however, that no action may be commenced more than four years after the act or acts constituting the fraud."  *Leighton Avenue Office Plaza, Ltd. v. Campbell*, 584 So. 2d 1340, 1344 (Ala. 1991).  The point is clear:  while the statutes listed within Section 6-5-574(b) may extend the limitations period beyond what they would otherwise be under Section 6-5-574(a), they cannot extend that period beyond the four-year outer limit imposed by both subsections.

7

Pivoting away from the Code, the plaintiffs assert that "Section 6-2-6 is merely a codification of the common law." (Doc. 65 at 22). The amended complaint alleges that the Agreement requires Thompson to indemnify Mississippi Valley for losses sustained due to errors in policies issued by him. (Doc. 12 at 4). Under the common law, the plaintiffs continue, the limitations period does not begin to run until the indemnitee's liability to a third party has become fixed by actual payment to the third party or by being cast in judgment to the third party. (Doc. 78 at 21, 23). As that has not occurred with respect to Wells Fargo, the plaintiffs conclude that the limitations period has not expired or even commenced.

"*All* legal service liability actions against a legal service provider *must* be commenced" within the time periods discussed above. Ala. Code § 6-5-574(a) (emphasis added). This absolute language admits of no exception. If Count One constitutes a "legal service liability action" under Section 6-5-572(1), its timeliness must be measured by the statute and not by any common-law rule that might apply absent the statute.

The plaintiffs respond that it is not simply that the statute of limitations in an indemnity case does not begin to run until payment or judgment but that the cause of action does not even accrue until that point. (Doc. 78 at 20-23 (citing *Ex parte Stonebrook Development, L.L.C.*, 854 So. 2d 584 (Ala. 2003)). Since "the statute of limitations [under Section 6-5-574] begins to run … when a cause of action 'accrues,'"[5] they conclude, it cannot have expired as to their indemnity claim because that claim has yet to accrue. They believe their position is vindicated by *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 939 So. 2d 885 (Ala. Civ. App. 2005).

In *Jones*, the client bank was sued for malicious prosecution after its lawyers filed a collection suit against an individual ("Greene") that plainly had no liability for the debt. The client filed a third-party complaint against the lawyers under the Act, seeking indemnity for any liability the client might have to Greene.

---

[5] *Coilplus-Alabama*, 53 So. 2d at 905.

The Court stated that "the existence of any malpractice claim the Bank might have had against the lawyers was contingent upon the Bank's potential liability to Greene for malicious prosecution," such that the limitations period on the malpractice claim could not begin to run until "the trial court entered a judgment for Greene in the underlying action and Greene became entitled to sue the Bank for malicious prosecution."  939 So. 2d at 897, 899.  *Jones*, then, does *not* say that an indemnity claim under the Act accrues only when the client pays the third party or is cast in judgment to the third party.  On the contrary, *Jones* says that the indemnity claim accrues long before the client pays or is cast in judgment, when the client becomes potentially liable to the third party.

To the doubtful extent that *Jones* would otherwise be helpful to the plaintiffs' position, the Supreme Court's ruling in *Hooper* negates it.  As noted above, *Hooper* held that "*any* cause of action Mississippi Valley had against Hooper for issuing insurance policies based on a faulty title opinion accrued when the policies were issued …."  707 So. 2d at 213 (emphasis added).  The plaintiff in *Hooper* "claimed … a right of indemnity," *id*. at 212, so such a claim is captured by *Hooper*'s holding.

The plaintiffs end with two apparently throw-away arguments.  First, they complain that *Hooper* is bad policy because it encourages the filing of lawsuits that may never need to be decided.  Second, they ask the Court to replace *Hooper* with a rule apparently drawn from Illinois that would delay accrual until Thompson refused after demand to tender payment.  (Doc. 78 at 23-25).  The function of this Court, sitting in diversity, is to apply state law as it is, regardless of any party's assessment of its wisdom or preference for another rule.

For the reasons set forth above, the Court concludes that, if Count One is subject to the Act, it is barred by the statute of limitations.

**B.  Applicability of the Act.**

"There shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein."  Ala. Code § 6-5-573.  A "legal service provider" includes "[a]nyone licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama." *Id*. § 6-5-572(2).  Thompson was at all relevant times licensed to practice law by the State of Alabama.  (Doc. 50, Exhibit 1 at 1).  Count One therefore is covered by the Act if it constitutes a "legal service liability action."

A "legal service liability action" is defined as "[a]ny action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider's violation of the standard of care applicable to a legal service provider."  Ala. Code § 6-5-572(1).  "[W]e conclude, from the language of the statute, that the ALSLA does not apply to an action filed against a 'legal service provider' by someone whose claim does not arise out of the receipt of legal services."  *Cunningham v. Langston, Frazer, Sweet & Freese, P.A*., 727 So. 2d 800, 804 (Ala. 1999).  "Conversely, from a plaintiff's perspective, the ALSLA applies to any claim originating from his receipt of legal services."  *Id*. at 803.  The question is whether Count One arises from Thompson's provision of legal services.

The defendant in *Hooper* rendered title opinions incorrectly certifying that certain mortgagees would have first mortgage liens, and he then issued title insurance policies based on his incorrect certifications.  707 So. 2d at 211.  The Supreme Court ruled that any cause of action for issuing policies based on faulty title opinions was covered by the Act.  *Id*. at 213.  Under *Hooper*, the rendition of a title opinion by a lawyer constitutes the provision of legal services, such that any cause of action based on the faulty title opinion is subject to the Act.[6]  And under

---

[6] This ruling is not surprising, given that "a non-lawyer's rendering a title opinion regarding real property amounts to the unauthorized practice of law."  *Hooper*, 707 So.

*Hooper*, the lawyer's subsequent issuance of a title policy based on his own faulty title opinion is also subject to the Act – not because issuance of a policy constitutes the delivery of legal services, but because in that situation the lawyer's "duties as the title insurance agent [cannot] be divorced from [his] duty as an attorney." *Id*. at 216.[7]

Thompson, however, did not issue a title opinion. Instead, as the parties agree,[8] he performed title searches in 2001 and 2003, then issued commitments for title insurance, then issued title policies.

According to cases relied on by the plaintiffs, (Doc. 65 at 26; Doc. 78 at 7-8), "the issuance of title insurance … do[es] not constitute the practice of law" under Ala. Code § 34-3-6(c). *Coffee County Abstract and Title Co. v. State ex rel. Norwood*, 445 So. 2d 852, 855 (Ala. 1983). Likewise, the issuance of a commitment for title insurance – so long as the commitment does not encompass a title opinion – does not constitute the practice of law. *Land Title Co. v. State ex rel. Porter*, 299 So. 2d 289, 292, 295-96 (Ala. 1974). Thompson neither disagrees with these propositions nor suggests there is a meaningful difference between the "practice of law" under Title 34 and the provision of "legal services" under the Act. Thus, a ruling that the Act applies cannot rest simply on Thompson's actions in issuing commitments and policies.

---

2d at 215 (citing *Upton v. Mississippi Valley Title Insurance Co*., 469 So. 2d 548, 556 (Ala. 1985)).

[7] Thompson appears to believe that, under *Hooper*, issuance of a title policy by a lawyer always constitutes the provision of legal services. (Doc. 50 at 19; Doc. 80 at 4-5; Doc. 86 at 3). What *Hooper* actually stated was that, because a non-lawyer agent cannot be required to look behind a lawyer's title opinion before issuing a policy, when a lawyer as agent issues a title policy based on his own title opinion there is "no duty separate and apart from [his] duty as a legal service provider," and any claim as to issuance of the policy is thus based on the lawyer's provision of legal services in the form of a title opinion. 707 So. 2d at 216.

[8] (Doc. 50 at 1, 4; Doc. 65 at 6, 8, 11, 27; Doc. 78 at 7, 17).

Count One is therefore subject to the Act if, and only if, Thompson's performance of a title search constituted the provision of legal services. Thompson proposes that *Hooper* has already resolved this issue in his favor. He does not, and cannot, maintain that the Supreme Court's opinion addressed any such issue. Instead, he extracts from the complaint and amended complaint found in the case file maintained by the Circuit Court of Montgomery County that the *Hooper* plaintiff "was arguing that Mr. Hooper had issued title policies that were based on his own faulty title searches and opinions." (Doc. 86 at 4). Of course, what is in the pleadings and what a litigant argues before the Supreme Court can be widely different things, and Thompson has not attempted to show that, on appeal, the plaintiff pressed any issue concerning title searches. At any rate, whatever the plaintiff may have argued to the Supreme Court, that body did not address or decide whether a title search is covered by the Act.

"For a case to be stare decisis on a particular point of law, that issue must have been raised in the action, decided by the court, and its decision made part of the opinion of the case …." *Ex parte Town of Lowndesboro*, 950 So. 2d 1203, 1209 (Ala. 2006) (internal quotes omitted). Even if the *Hooper* plaintiff argued to the Supreme Court that the defendant's performance of a title search was not subject to the Act (a possibility Thompson has not shown to have occurred), the Supreme Court patently did not decide any such issue, and it did not make any such decision part of its opinion. In short, after *Hooper* the question remains an open one.[9]

Other than Thompson's ineffectual invocation of *Hooper*, the parties identify no Alabama appellate case addressing whether the performance of a title

---

[9] The plaintiffs move to strike the *Hooper* record for failure to identify it under Rule 26(a) and because it is irrelevant. (Doc. 83). Assuming that Thompson violated Rule 26(a), the Court finds the failure harmless under Rule 37(c)(1) since, as discussed in text, the record does not advance Thompson's position. The appropriate response to irrelevant evidence is not to strike the evidence but to consider it and afford it the weight (none) it deserves. Accordingly, the motion to strike the *Hooper* record is **denied**.

search by a lawyer is subject to the Act, and the Court's independent research has uncovered none.  Thompson, however, emphasizes a trial court decision which, he says, found *Hooper* to apply to a title search.  (Doc. 50 at 19-20; Doc. 80 at 9-11). His reliance is misplaced.

First, the Court's role in this diversity case, in the absence of an Alabama Supreme Court decision resolving the question, is to "anticipate how the Supreme Court would decide this case."  *State Farm Mutual Automobile Insurance Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011).  "In doing so, we consider, in addition to Supreme Court precedent, decisions of the State's intermediate appellate courts that appear to be on point, provided that there is no indication that the Supreme Court would reject them."  *Id*.  While it is permissible to look to state trial court decisions, they are of limited significance when the state courts themselves afford such decisions little weight and when the difficulty of even locating such decisions makes it unlikely that other, contrary trial court decisions will come to light.  *See King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 159-62 (1948); *accord Roecker v. United States*, 379 F.2d 400, 406 (5th Cir. 1967).  Trial court decisions are not regarded as precedent, *Scrushy v. Tucker*, 70 So. 3d 289, 309 (Ala. 2011), and Thompson does nothing to suggest that he has, or anyone else easily could, ensure that no other trial court decisions on the point exist.

Second, the trial court's exceptionally brief order merely states that "[t]his Court cannot distinguish plaintiff's claim against this defendant from claim [sic] by the plaintiff against the defendant in" *Hooper*, without reciting any facts or offering any reasoning for its conclusion.  (Doc. 50, Exhibit 37).  This judicial silence is especially important because the defendant's brief in support of his motion for summary judgment argued that "the work of Mr. Dillard *in issuing a title opinion* was that of a legal service provider and therefore the ALSLA applies."  (*Id*., Exhibit 35 at 5 (emphasis added)).  There is thus a high probability that the trial court incorrectly understood that the case involved a title opinion and

13

issued its ruling on that basis.  While an express, reasoned analysis by a state trial court might merit consideration by a federal court in determining how the Alabama Supreme Court would resolve the pertinent legal issue, the opaque, one-line conclusion offered here does not.

Thompson attempts to enhance the weight of the trial court's ruling by noting that its grant of summary judgment was affirmed by the Alabama Court of Civil Appeals.  And so it was, but without opinion pursuant to Alabama Rule of Appellate Procedure 53(a).  (Doc. 50, Exhibit 42).  "An order of affirmance issued by the Supreme Court or the Court of Civil Appeals by which a judgment or order is affirmed without opinion, pursuant to section (a), shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for [certain purposes not germane here]."  Ala. R. App. P. 53(d).  "[A] federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court."  *King*, 333 U.S. at 161 (footnote and internal quotes omitted).  The appellate court's bare affirmance does not furnish this Court with grounds to conclude that the Alabama Supreme Court would declare a lawyer's performance of a title search to be the provision of legal services within the Act.  This is especially so in light of the material discussed below.[10]

As noted, the plaintiffs assume that only that which constitutes the "practice of law" under Title 34 constitutes the provision of "legal services" for purposes of the Act, and Thompson offers no refutation of this proposition.  The Court therefore accepts the identity of these concepts for purposes of this case.

The Alabama Code identifies four categories of the practice of law.  First, representing another before a court or other body.  Ala. Code § 34-3-6(b)(1).

---

[10] The plaintiffs move to strike the *Dillard* record as irrelevant.  (Doc. 83).  As discussed in note 9, *supra*, irrelevant evidence is not subject to being stricken, merely ignored.  Accordingly, the motion to strike is **denied**.

Second, representing another in connection with the prevention or redress of a wrong or the establishment or enforcement of a right. *Id*. § 34-3-6(b)(3). Third, resolving disputed accounts, claims or demands of another. *Id*. § 34-3-6(b)(4). Thompson plainly did not engage in any of this activity when he performed a title search.

The final category of the practice of law includes two types of conduct: "advis[ing] or counsel[ing] another as to secular law" and drawing (or assisting in the drawing of) "a paper, document or instrument affecting or relating to secular rights." Ala. Code § 34-3-6(b)(2). In *Land Title*, the state of Alabama accused a title insurer of engaging in the unauthorized practice of law. The insurer had "made an examination of the public records of Blount County" and had issued a title commitment based thereon. 299 So. 2d at 290. The Supreme Court held that issuance of the commitment did not constitute the rendering of advice or counsel and did not constitute the preparation of any document relating to secular rights and therefore did not constitute the practice of law. *Id*. at 290, 295-96. Along the way, the Supreme Court confirmed that "[i]t is clear that a title insurance company must be allowed to review public records and specify any curative work to be done before it will issue a policy." *Id*. at 295. This statement indicates that the performance of a title search (which is a review of public records, Ala. Code § 27-25-3(10)) does not constitute the practice of law, even when the search results in the inclusion of requirements and exceptions in the title commitment.

In addition, "preparing abstracts of title" does not constitute the practice of law. Ala. Code § 34-3-6(c). An "abstract of title" is "[a] compilation or summary of all instruments of public record of whatever kind or nature which in any manner affect title to a specified parcel of real property." *Id*. § 27-25-3(1). A title search is "[a] search of the records in the office of the judge of probate," *id*. § 27-25-3(10), from which search "[t]he examiner then prepares an abstract of the documents examined." Black's Law Dictionary 1333 (5th ed. 1979). If preparing an abstract of title does not constitute the practice of law, it is difficult to see why

performing the title search from which an abstract of title may be prepared would constitute the practice of law.[11]

Finally, there is uncontroverted evidence that many title searches in Alabama are routinely undertaken by non-lawyers. (Matthews Deposition at 22; Doc. 66, Exhibit 7 at 3, ¶ 6). As the plaintiffs note, (Doc. 78 at 18), if Thompson's view is accepted and performance of a title search constitutes the practice of law, all of these laypersons are engaged in the unauthorized practice of law and subject to criminal prosecution. Ala. Code § 34-3-7. That outcome does not make it impossible for Thompson's stance to be correct, but the potentially serious consequences of adopting his position cry out for a solid, reasoned justification for doing so.

Thompson, however, provides none. Instead, he asserts that, in the course of performing his title searches, he "analyze[d] the documents in the chain of title, dr[e]w conclusions from those documents, and formulate[d] an opinion as to the status of title and how the documents in the chain of title affect record title to the property," with those opinions "based upon [his] legal education, training, and experience." (Doc. 50, Exhibit 1 at 2). In light of *Land Title*'s pronouncement that conducting a title search and issuing a title commitment based on its results does not constitute the practice of law, Thompson's affidavit is ineffectual. Even absent *Land Title*, however, Thompson's title search could constitute the practice of law under Section 34-3-6(b)(2) only if it included "advis[ing] or counsel[ing]" Mississippi Valley as to secular law. While Thompson may have *formed* opinions as to secular law in the course of his title search, he does not claim to have *advised* or *counseled* Mississippi Valley concerning whatever opinions he held. On the contrary, and on his own, he simply prepared title commitments setting forth

---

[11] Thompson testified that, upon receiving a title order, he would either order an abstract of title or do a title search himself, (Thompson Deposition at 20), reflecting their functional equivalency. As to the 2001 Policy, Thompson relied on existing abstracts, supplemented by his review of courthouse records for the period post-dating the abstracts. (*Id*. at 57-58).

requirements and exceptions – conduct that *Land Title* holds not to constitute the practice of law. [12]

Thompson notes that Mississippi Valley relied on him "to evaluate the documents in the chain [of title] and … evaluate the risks that the company is and is not willing to accept." (Doc. 50 at 18). Again, however, Thompson did not advise or counsel Mississippi Valley about those risks but at most considered those risks in making his own determination to issue the subject commitments and policies. Moreover, the evaluation of risk is not a lawyer's monopoly but the fundamental attribute of an insurer. *See, e.g., Parker v. Ward*, 614 So. 2d 975, 977 (Ala. 1992) ("[T]itle policies except any risks apparent after a title search."); *Land Title*, 299 So. 2d at 295 (the issuance of a title commitment "rested entirely upon 'risk' versus the premium charged for such undertaking").

Thompson emphasizes that the Agreement required him to ensure that "all commitments and policies issued under this contract … are issued only in accordance with and in compliance with the written opinion of any approved attorney." (Doc. 50, Exhibit 3 at 1, ¶ 3). Similarly, he notes that the agent's manual requires an approved attorney to issue a title opinion and/or a certification of title. (*Id.*, Exhibit 4 at 1-2, 1-4). He concludes that the Agreement and manual

---

[12] The plaintiffs have filed a motion to strike portions of Thompson's affidavit as an expert opinion offered without either qualification or compliance with discovery rules. (Doc. 77). Thompson responds that all the challenged material is composed of statements of fact and lay opinions. (Doc. 85). The Court determines that Thompson's testimony that he analyzes documents, draws conclusions from them, and formulates opinions as to the status of title based on his legal judgment are statements of fact. As to this testimony, the motion to strike is **denied**. His testimony that his work searching title is performed "as a legal service provider" in the "regular course of [his] business as a practicing attorney," and that this work "require[s] [him] to perform legal services" and constitutes the "practice of law," is the expression of expert opinion. Since Thompson does not argue that it is permissible for him to offer expert opinion testimony, the motion to strike this testimony is **granted**.

Of course, even were the motion to strike denied in its entirety, Thompson's mere opinion that his challenged conduct comes within the Act could not possibly alter the Court's conclusion that the Alabama Supreme Court would rule otherwise. This is especially true given the painful absence of any reasoned legal basis for his bald opinion.

"specifically require the involvement of an attorney prior to the issuance of a title policy." (Doc. 50 at 18; Doc. 80 at 6).

As Thompson concedes, he was not an "approved attorney" as the parties employed that term but rather an "attorney agent." (Doc. 50 at 17-18). And as he likewise concedes, neither he nor any other attorney created a written opinion before issuing the subject title commitments and policies. Nevertheless, since Thompson was an attorney, and since he was an "attorney agent," it can safely be assumed that the parties did intend an attorney to be involved prior to issuance of a title policy. But the mere involvement of an attorney does not demonstrate that the attorney's actions represent the practice of law; the parties could agree that an attorney must sign all company checks, but that could not convert the attorney's signature into the practice of law.

For the reasons set forth above, the Court concludes that the Alabama Supreme Court would rule that Thompson's performance of title searches, his issuance of title commitments, and his issuance of title policies in relation to the 2001 Policy and the 2003 Policy did not constitute the provision of legal services and are not within the Act. Accordingly, Count One is not subject to the Act's statute of limitations. Since Thompson's motion for summary judgment is based exclusively on that statute of limitations, his motion is due to be denied.

## II. Plaintiffs' Motion for Summary Judgment.

Thompson's resistance to the plaintiffs' motion for summary judgment is confined to his statute-of-limitations argument. (Doc. 80). Seeing this, the plaintiffs declare victory. (Doc. 84 at 2). Their celebration is premature.

Because Rule 56(a) specifies that summary judgment may be entered only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property*,

363 F.3d 1099, 1101 (11th Cir. 2004).  The quoted statement constitutes a holding. *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008).  This rule does not allow the Court to grant summary judgment merely because Thompson has offered no opposition to the merits of the motion.

On the other hand, the Court's review is less searching than it would be had Thompson opposed the motion on its merits.  "The district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials.  [citation omitted]  At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment." *One Piece of Real Property*, 363 F.3d at 1101.  Should this review reveal the plaintiffs' entitlement to summary judgment, under *Dunmar* the Court will not consider any legal or factual arguments Thompson could have, but has not, asserted in opposition.

"[A] principal is entitled to indemnification from its agent for damages caused by the agent's tortious conduct." *Line v. Ventura*, 38 So. 3d 1, 13 (Ala. 2009).  Such tortious conduct includes the agent's "negligent failure to perform his duties." *Id*.  "Negligence is defined as the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation …." *Dixon v. Hot Shot Express, Inc.*, 44 So. 3d 1082, 1092 (Ala. 2010).

It is uncontroverted that all of Thompson's work at issue herein was performed pursuant to the Agreement, which "designates and hereby appoints [Thompson], as agent of [Mississippi Valley] to issue policies of title insurance upon properties" in Alabama.  (Doc. 66, Exhibit 8 at 1).  It is uncontroverted that Thompson was an agent and Mississippi Valley a principal for purposes of tort liability.

It is uncontroverted that, under the Agreement, Thompson "agree[d] to indemnify [Mississippi Valley] from all loss, cost or damage which [Mississippi Valley] may sustain or become liable for on account of … failure of any

commitment … or policy issued by [Thompson] … to correctly … reflect the then condition of the title resulting from or occurring by reason of errors and omissions in [Thompson's] abstracting or record search of the title, or the failure to reflect an appropriate requirement or exception therein as to any lien, claim, encumbrance or other defect … known to [Thompson]."  (Doc. 66, Exhibit 8 at 1).

It is uncontroverted that the 2001 Policy and the commitment preceding it were issued by Thompson without reflecting the then condition of title, in that they did not note the existence of the Marion Bank mortgage, much less identify it as an exception or requirement, even though the mortgage was properly recorded and indexed and even though Thompson had personal knowledge of the mortgage.[13]  It is uncontroverted that this failure constituted a failure to exercise the standard of care that a reasonably prudent title agent would have exercised in a similar situation.  (Doc. 66, Exhibit 6 at 3, 4-5).  It is further uncontroverted that this failure breached the Agreement and gave rise to an indemnity obligation.  It is further uncontroverted that this failure proximately caused damage to the plaintiffs, since the commitment and policy insured CTX in a first lien priority position despite Marion Bank's prior recorded mortgage, obligating the plaintiffs to make payment to Wells Fargo on the 2001 Policy after the Rabbs defaulted and Marion Bank foreclosed.

It is uncontroverted that the commitment preceding issuance of the 2003 Policy was issued by Thompson without reflecting the then condition of title, in that it did not note the existence of the CTX mortgage, much less identify it as an exception or requirement, even though that mortgage was properly recorded and indexed and even though Thompson had personal knowledge of the mortgage.  It is uncontroverted that this failure constituted a failure to exercise the standard of care that a reasonably prudent title agent would have exercised in a similar situation.  (Doc. 66, Exhibit 6 at 3, 5-6).  It is further uncontroverted that this

---

[13] Thompson closed the loan for Marion Bank in 1997 and issued Marion Bank a title policy.  (Doc. 65 at 7).

failure breached the Agreement and gave rise to an indemnity obligation.  It is further uncontroverted that this failure was the proximate cause of any further damage to the plaintiffs.[14]

## CONCLUSION

For the reasons set forth above, Thompson's motion for summary judgment is **denied** and the plaintiffs' motion for partial summary judgment as to liability is **granted**.  Determination of the amount of the judgment to be entered against Thompson must await resolution of Wells Fargo's claim against Marion Bank.

DONE and ORDERED this 12th day of October, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[14] Whether the plaintiffs experienced any further damage from this failure depends on the success of Wells Fargo's claim in Count Two against Marion Bank and so cannot be resolved on the instant motion.